UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KARLA GERNER,

                Plaintiff,

v.                                      Case No. 3:10-cv-885-JAG

COUNTY OF CHESTERFIELD, VIRGINIA,

                Defendant.

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

Plaintiff Karla Gerner ("Plaintiff" or "Gerner"), by counsel, states as follows in support of her Motion to Compel discovery from Defendant County of Chesterfield, Virginia ("County" or "Chesterfield"):

## INTRODUCTION

This lawsuit, filed by the County's former head of human resources for the better part of twelve (12) years, presents a classic example of, and intimate look at, a "Good Ol' Boy" network.  In particular, it sheds light on some of the lavish severance packages that have been heaped upon those County employees -- many of whom were non-performers -- lucky enough to be considered within the Chesterfield County Administrator's inner circle.

Unfortunately for Ms. Gerner, as a single female, she was not considered part of this inner circle.  Consequently, when the County unsuccessfully sought to secure the Plaintiff's resignation in December of 2009, she wasn't offered the kind of "sweetheart deal" that had been offered her similarly situated male counterparts in the past, *or those that were still being developed for her similarly situated male counterparts at the time she was terminated.*

Contrary to the County's repeated assertions, the "sweetheart deals" alleged in the Complaint were not relics of the distant past; they did not all pre-date the tenure of James J.L. Stegmaier ("Stegmaier") or any downturn in the economy.  Instead, as detailed in the attached affidavit of Plaintiff, attached as Exhibit A and incorporated herein by reference, at least four severance deals for Plaintiff's similarly situated male counterparts were being discussed, analyzed, and negotiated, all the way up until the time that Plaintiff was terminated; deals which were considerably more generous than that ultimately offered Plaintiff.  Id. at ¶¶ 27, 29.  It cannot be emphasized enough that these four men -- Paul Patten, Thomas E. Jacobson, Thomas Taylor, and Millard D. "Pete" Stith, Jr. -- were all separated from the County *after* Plaintiff was terminated.  Id. at ¶ 30.

The County, without first seeking (let alone securing) the entry of a Protective Order, has unilaterally refused to provide any details regarding the severance terms each of these four men received, as well as other discoverable information.

This motion follows.

## BACKGROUND

**I)      CHESTERFIELD'S HISTORY OF MAKING DEALS.**

Plaintiff first began working for Chesterfield, in human resources, in 1983.  Pltf. Aff. at ¶ 3.  Over her career, her work record was exemplary.  Id. at ¶ 2.  In July of 1997, after having served eight years as the Assistant Director of Human Resource Management, County Administrator Lane Ramsey ("Ramsey") promoted Plaintiff to Director of Human Resources Management ("HRM").  Id. at ¶ 5.  Her predecessor, Rick Willis, had been asked to resign, a fact made known to Plaintiff before she formally assumed Willis' role.  Id. at ¶ 6.  Willis received a

handsome severance package which included remaining on payroll for an additional six or more

months, despite performing no work or duties, so that he could reach full retirement benefits with

the Virginia Retirement System ("VRS").  Id.  Since his severance package included more time

on payroll, Willis was not only receiving his full salary, he also received full benefits during this

time.  Id.  These benefits included health care and additional months toward his VRS retirement

benefit and the County's Supplemental Retirement Plan.  Id.

Likewise, in 2006, Ramsey indicated to Plaintiff that he was growing increasingly

dissatisfied with the performance of James Dunn ("Dunn"), who was the County's Director of

Economic Development, and therefore had a special position created for him -- Economic

Development Manager for Meadowville Technology Park.  Dunn was transferred, at his director

salary, in September of 2005.  Id. at ¶ 7.  When it was determined that Dunn's service was no

longer needed after several months of accommodation, he received a severance agreement which

included keeping him on payroll for six or more months so he could accrue more retirement time

toward VRS.  Id. at ¶ 8.  Dunn was not required to perform any work for the County during this

time.  Id.

Other accommodations were likewise made to keep Plaintiff's counterparts, executive

males that were not meeting performance expectations, employed.  For example, in 2002,

Deputy County Administrator Stegmaier grew increasingly dissatisfied with the performance of

Paul Patten ("Patten") who was the Director of Real Estate Assessments for the County.  Id. at ¶

9. Consequently, Stegmaier, along with Millard D. "Pete" Stith, Jr. (hereinafter "Stith"), who

was the Deputy County Administrator for Community Development for the County, asked that

Plaintiff assist in creating a new, specially-created position for Patten: Community Development

3

Automation Coordinator.  Id.  Patten was transferred to this position in 2002 but continued to

receive the same salary as a Director.  Id.

At the time this deal was struck with Patten in 2002, Stegmaier asked that Plaintiff assist

with accommodating Patten for three (3) years because "he still has kids in school."  Id. at ¶ 10.

Nevertheless, Patten was allowed to remain in this same position an additional four years beyond

the three year accommodation until October 2009 when, upon information and belief, the County

cut a deal with Patten to get him to retire which included part-time employment but with

sufficient hours so that he would make the same salary as when he worked full-time including

full retirement benefits.  Id.  Patten finally retired, for real, in 2011, i.e., after Plaintiff was

terminated.  Id.

Similarly, in 2004, Ramsey was feeling the pressure from the business community and

the Board of Supervisors due to the increasing dissatisfaction with the performance of Thomas E.

Jacobson ("Jacobson"), who was the County's Director of Planning.  Ramsey, Stith, and

Stegmaier met with Plaintiff to discuss options for Jacobson.  Following several meetings,

Ramsey asked Plaintiff to assist with creating a new, specially-created, position for Jacobson:

Director of Revitalization.  Id. at ¶ 11.  Jacobson moved to this position in May 2004 but was

allowed to keep the same salary.  Id.  Stith did not want the business community to perceive this

move as a demotion, so Stith received approval of a $7,500 salary increase in lieu of a car

allowance for Jacobson.  Id.  Jacobson retired on or about January 31, 2012, i.e., after Plaintiff

was terminated.

Finally, the County had a history of accommodating Stith.  In July 2007, Stegmaier was

promoted from Deputy County Administrator to County Administrator upon the retirement of

Ramsey.  Id. at ¶ 13.  In addition, in January 2008, four of the five members of the County Board

4

of Supervisors were newly elected. Id. In approximately May 2008, Stegmaier met with Plaintiff

and stated that Stith "needed to go." Id. at ¶ 14. According to Stegmaier, the new Board of

Supervisors was not satisfied with Stith. Id. Stegmaier also shared his views that Stith was a

serial non-performer. Id.

Over the ensuing approximately year and a half, Stegmaier would repeatedly ask HRM to

calculate Stith's retirement benefits based upon a variety of retirement dates. Id. at ¶ 15. Stith

apparently became aware that discussions about his future with the County were being held

because he informed Plaintiff and Deputy County Administrator William Johnson ("Johnson")

that he was aware that Stegmaier wanted him to retire, but he wouldn't do so unless the County

paid him $100,000. Id. at ¶ 16. Otherwise, Stith informed Plaintiff, he would file a racial

discrimination lawsuit. Id. In a later conversation Plaintiff had with Stegmaier, he confirmed

that Stith had quoted $100,000 as his asking price for his retirement. Id.

Over this same year and a half period, Stegmaier also asked that HRM perform a "gap

analysis" between what Stith was earning and his retirement benefits if Stith were to retire. Id. at

¶ 17. Stegmaier contemplated keeping Stith on the County's payroll as a part-time employee for

special projects, such as Black History Month, so that Stith could make the same amount

including retirement pay and part-time pay as he would earn if he was still employed in a full-

time capacity. Id. Eventually, Stegmaier told Plaintiff that he was not going to deal with Stith

because he feared that Stith would file a charge of racial discrimination. Id. at ¶ 18. Stith retired

on or about April 1, 2010, i.e., after Plaintiff was terminated. Id. at ¶ 19.

Over her twenty-six (26) year career with the County, Plaintiff cannot recall a single

instance where a rank-and-file employee of Defendant, such as a police officer, ever received a

special accommodation such as that set forth above. Id. at ¶ 21.

II)      **THE EFFICIENCY TEAM.**

In 2008, James B. Holland, a member of the County Board of Supervisors, created a task force called the "Efficiency Team," whose goal was to identify cost-saving measures associated with the County's budget for Fiscal Year 2010 ("FY2010") (effective July 1, 2009) and beyond. Id. at ¶ 22.  Plaintiff was one of six individuals appointed to the Efficiency Team, along with the Director of Internal Audit, Director of Budget and Management , Deputy County Administrator for Management Services, and two School Board executives.  Id.

The Efficiency Team met often throughout 2008 and 2009.  Id. at ¶ 23.  It was focused on identifying areas that could be cut in the budget -- programs, services, capital and operational funding, and positions impacted due to the elimination or consolidation of programs.  Id.  It also considered process improvements that would have a positive impact on the budget.  Id.  Late in calendar year 2008, the Efficiency Team had a list of recommended budget cuts that included reorganization and consolidation recommendations totaling over $840,000 in reoccurring annual savings beginning July 1, 2009.  Id. at ¶ 24.  This was a net savings after considering staffing needs and some responsibilities being performed by positions at a lower level.  Id.  These departmental consolidation recommendations included the elimination of the following positions:  Director of Revitalization (Jacobson), Community Development Automation Coordinator (Patten), and Community Development Block Grant Director Thomas Taylor ("Taylor").  Id.

Stegmaier supported these three positions being eliminated effective July 1, 2009.  Id. at ¶ 25.  He was particularly pleased that Taylor had been identified since Stegmaier was never pleased with his performance.  Id.  Stegmaier asked Johnson and Plaintiff to meet with Stith and other executives with staffing cuts.  Id.  Over $400,000 in net budget savings was identified in

the Community Development area after the elimination of these three positions and staffing

necessary duties at a lower level.  Id.

Stith was not happy with the Efficiency Team's recommendations even though Patten

and Taylor were both eligible for full retirement.  Id. at ¶ 26.  Throughout 2009, both Stegmaier

and Stith asked HRM, numerous times, to analyze retirement benefits for Jacobson, Patten, and

Taylor in order to effectuate the Efficiency Team's recommendations but allow them to reach

full retirement benefits or accrue more than 30 years to increase their monthly retirement benefit.

Id. at ¶ 27.  Later, a deal was discussed with Patten that included retirement and working part-

time to "keep him whole" so his earnings would remain the same.  Id.  Options were also

discussed in 2009 related to Jacobson and Taylor.  Id.  Throughout this time and up until

Plaintiff's termination, the deals that were being discussed for these three men all provided for

continuing payroll and/or benefits for them for a considerably longer period of time than the

mere three months' worth of severance pay which Plaintiff was ultimately offered in December

of 2009.  Id.  These recommendations were supposed to be effective July 1, 2009, yet none of

them were separated in 2009.  Id.


III)    **PLAINTIFF'S TERMINATION.**

Instead, in December of 2009, Plaintiff was terminated short of her eligibility for full

retirement (and she was not 50 years old so she was ineligible for an early reduced retirement

pension).  Id. at ¶ 28.  Unlike Jacobson, Patten, Taylor, or Stith, no one ever performed any

analysis or computation of ways to try and keep Plaintiff "whole" with respect to her VRS or

supplemental retirement benefits.  Id.  Plaintiff was never offered a different position or

additional time on payroll for such purposes.  Id.

In short, separation deals were in the works with Jacobson, Patten, Taylor, and Stith when Plaintiff was abruptly terminated in December 2009; deals which were considerably better than three months' worth of severance. Id. at ¶ 29.  Unlike these four men, Plaintiff had no advance notice that a forced resignation or termination was coming. Id.  Finally, despite an exemplary work record, Stegmaier completed the Report of Separation document in Plaintiff's file and indicated "unable to determine" related to her Rehire Eligibility. Id.  This is a red flag to anyone in human resources and the "unable to determine" status was historically used when employees were not in positions long enough to assess their performance. Id.

These four men were all separated *after* Plaintiff was terminated: Jacobson (**2012**); Patten (**2011**); Taylor (**July 1, 2010**); and Stith (**2010**). Id. at ¶ 30.  Upon information and belief, they all had full VRS retirement benefits and very attractive Supplemental Retirement benefits when they finally resigned. Id.

In addition, there may be other similarly situated male counterparts who received more generous severance packages than that offered Plaintiff, but the County has not agreed to disclose such information.

IV)    **PLAINTIFF'S SUIT AND DISCOVERY.**

A)    *The Broadly Worded Complaint Is Not Restricted To A RIF.*

Plaintiff brought suit against the County under Title VII of the Civil Rights Act of 1964 contending that on December 15, 2009, she was informed that her position was being eliminated due to a "re-organization." Compl. at ¶ 17.  The Complaint alleges that at this meeting on December 15, 2009, Plaintiff was asked to sign a Separation Agreement indicating that she voluntarily resigned from her position and waived all causes of action against the County. Id. at

8

¶ 18. In exchange, Gerner would receive 3 months' severance pay and health insurance benefits. Id. However, the Complaint alleged, prior similarly situated male department directors whom the County sought to terminate were offered considerably more favorable severance packages. Id. at ¶¶ 1, 23. Gerner was given until December 21, 2009 to sign the Separation Agreement. Id. at ¶¶ 19-20. After she refused to sign the Separation Agreement, she was terminated with a retroactive effective date of December 15, 2009. Id. at ¶ 21.

Although the Complaint referenced four unnamed individuals as being examples of some of her comparators, it is clear that nowhere within the Complaint does it restrict Plaintiff's "similarly situated male counterparts" to only those who were part of any County reorganization or reduction-in-force (or "RIF").[1]  Nevertheless, as noted below, the County has unilaterally decided that it will only produce information concerning employees who were part of its reorganization or RIF.

### B)      Discovery -- Curtailed Unilaterally And Without Authority By County.

Plaintiff propounded her first set of interrogatories and requests for production on April 13, 2012. In a follow-up letter sent to defense counsel on July 2, 2012, Plaintiff stated her willingness to withdraw any discovery related to Rick Willis and James Dunn and, more importantly, to reduce the discovery timeframe from 2007 to the present. See Letter of July 2, 2012 from Mark D. Dix, Esquire to County Attorney (attached as Exhibit B).

---

[1] If the Court should so read the Complaint as restricted to only those similarly situated male counterparts who might have been part of a County reorganization or RIF, then Plaintiff renews her motion under Fed. R. Civ. P. 15 for leave to file an amended complaint.

Following a brief stay in the proceedings, Defendant interposed objections on June 12, 2012, and responded on June 28, 2012.  A copy of the County's responses, redacted to that discovery at issue, is attached as Exhibit C.

With respect to Plaintiff's Interrogatories, Interrogatory 9 requested that Defendant:

> 9.      Identify any and all executives with Defendant who had their employment terminated between January 1, 200[7] and the present.  For each executive identified, provide the following information:
> a)      Identify the amount of advance notice given to each executive;
> b)      Identify how long each executive worked between the time notice was given and the effective separation date; and
> c)      For each executive, describe any and all severance (and/or settlement) pay, benefits, and/or packages offered.

In its response, the County, without authority, self-restricted its response to only those directors who were "involuntarily separated from the County between August 14, 2007 and the present by virtue of her position being eliminated." See Deft. Interr. Answers at 9.  During the parties' Rule 37 Conference on July 10, 2012, Defendant stated that it had taken the position that it only had to disclose information concerning those terminated as part of a reorganization or RIF.  By artfully, and without authority, so restricting the scope of discovery, the County responded that no one fits its self-serving criteria other than the Plaintiff.

Similarly, Interrogatory 10 requested that Defendant:

> 10.      Identify any and all executives with Defendant who were offered severance (and/or settlement) pay, benefits, and/or packages between January 1, 200[7] and the present.  For each executive identified, provide the following information:
> a)      Identify the precise terms of all offers made by Defendant to the executive in the
> way of severance (and/or settlement) pay, benefits, and/or packages;
> b)      Identify whether the executive was offered the opportunity to be kept on

> Defendant's health care plan for life;
>
> c)   Identify the terms of the offer ultimately accepted by the executive.

As with Interrogatory 9, in its response to Interrogatory 10, the County, without authority, self-restricted its response to only those "director positions . . . eliminated at or around the time that Gerner's position was eliminated." See Deft. Interr. Answers at 10. During the parties' Rule 37 Conference on July 10, 2012, Defendant reiterated its position that it only had to disclose information concerning those terminated as part of a RIF or reorganization. By artfully, and without authority, so restricting the scope of discovery, the County responded that no one else fits its self-serving criteria.

With respect to Interrogatories 15 through 19, the County refused to respond stating that Plaintiff had exceeded her permissible number of interrogatories (a total of 19 were propounded).

With respect to Plaintiff's Requests for Production, Requests 2 through 5 requested all employment and severance information related to Stith, Jacobson, Patten, and Taylor. The County refused to disclose this information because, again, it had made the unilateral decision that it did not need to. In the County's view, it only had to turn over information concerning members of a RIF.[2]

Likewise, Requests for Production 8 and 9 asked for retirement benefit and compensation information for Plaintiff, Stith, Jacobson, Pattern, and Taylor. The County only agreed to produce this information for Plaintiff because, in its sole judgment, the County doesn't need to turn over the information concerning the four men.

---

[2] The County also cited the need for a Protective Order. However, as noted in the County Attorney's letters of July 3, 2012 (attached as Exhibit D), this is a red herring since the County has taken the position that, even with a Protective Order, it will not disclose this information.

11

Request for Production 18 requested that Defendant produce:

> 18.    Any and all documents discussing, referring to, and/or relating to the separation and/or termination of executives other than Director of Human Resource Management for the years 2006 through 2010.

The County produced absolutely no information calling the request "overly broad, unduly burdensome, vague, and calls for information that is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence."

Request for Production 22 specifically asked for separation or severance agreements related to the four men:

> 22.    Any and all separation agreements, settlement agreements, severance agreements, releases, and/or other contractual agreements between Defendant and the following individuals:
> b)     Stith
> c)     Jacobson
> d)     Patten
> e)     Taylor

The County refused to provide any responsive information because it had made the decision not to.

Requests for Production 26 and 27 asked for a copy of emails or other documents discussing retirement benefits or projections for Plaintiff and the four men.  The County agreed only to produce documentation relating to Plaintiff because it had determined in its sole judgment that the four men were irrelevant.

Request for Production 28 requested that Defendant produce any emails or documentation reflecting Plaintiff and the four men being considered for part-time employment. The County refused to produce any information concerning the four men.

Request for Production 29 requested that Defendant produce all documents associated with the Efficiency Team.  The County refused.

Because the County has defended its actions based upon economic hardship, Request for Production 33 asked for information concerning gainsharing revenues the County has received from Anthem as a result of the opening of an employee health center.[3]  The County refused to share this information.

Finally, suspecting that the County may try to explain away any differences in its handling of Plaintiff's and Stith's employment situations, Request for Production 41 asked for information concerning any sexual harassment grievances, charges, complaints, etc. filed against Stith.  The County refused to comply with this Request.

It is undisputed that prior to taking these positions regarding discovery, the County never applied for, let alone obtained, a Protective Order from this Court pursuant to Fed. R. Civ. P. 26(c).

## ARGUMENT

A)    *Standard of Review.*

Federal Rule of Civil Procedure 26(b)(1) provides as follows:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense--including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter. For good cause, the court may order discovery

---

[3] As noted in the attached affidavit of Plaintiff, upon information and belief the County has been experiencing an enormous windfall in gainsharing revenues from Anthem as a result of the opening of an employee health center.  Pltf. Aff. at ¶ 36.

> of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).

Fed. R. Civ. P. 26(b)(1).   As this Court has noted previously:

> Consistent with the policy that the Federal Rules of Civil Procedure be "construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding," discovery under the Federal Rules is designed to foster resolution on the merits and prevent surprise. Compare Fed. R. Civ. P. 1 with Fed. R. Civ. P. 26(b)(1). See, e.g., Bailey v. Fairfax County, No. 1:10cv1031, 2011 U.S. Dist. LEXIS 95281, at *4 (E.D. Va. August 18, 2011). This purpose is frustrated whenever a party repeatedly fails to comply with its discovery obligations. *In practice, a party cannot pursue its claims or defenses without an adequate opportunity to obtain evidence through the broad discovery contemplated by the Federal Rules.* See Kline v. Martin, 345 F. Supp. 31, 32 (E.D. Va. 1972) ("Federal Rules contemplate the broadest discovery possible in the search for the truth").

Stewart v. VCU Health Sys. Auth., 2011 U.S. Dist. LEXIS 153154, *23-24 (E.D. Va. Nov. 22, 2011) (emphasis added); see also VEPCO v. Sun Shipbuilding and Dry Dock Co., 68 F.R.D. 397, 400 (E.D. Va. 1975) ("the discovery rules are to be broadly construed").

The burden of proof in this discovery dispute rests squarely with the County.  As this Court has previously noted, "When discovery disputes arise, the burden of proof is with the party objecting to the discovery to establish that the challenged production should not be permitted." Humanscale Corp. v. Compx Intl. Inc., 2009 U.S. Dist. LEXIS 120197, *5 (E.D. Va. Dec. 24, 2009) (citing Finley v. Trent, 955 F. Supp. 642, 648 (4th Cir. 1997)).

B)      *The Interrogatories And Requests For Production Are Reasonably Calculated To Lead To The Discovery Of Admissible Evidence.*

With the foregoing principles in mind, it is clear that the disputed interrogatories and requests for production are reasonably calculated to lead to the discovery of admissible evidence and, under the broad discovery contemplated by the Federal Rules, Defendant should be compelled to respond accordingly. In an effort to accommodate Defendant and move this matter towards final resolution after years of protracted litigation, Plaintiff has taken the extraordinary measure of identifying the four male comparators of which she is currently aware. (Again, there may be more, but the County is refusing to say). These are not four men who were merely picked off of the street. Instead, these were four high-level, highly-paid, but problem County executives who were having handsome severance or separation packages analyzed and developed for them by HRM just prior to Plaintiff's termination. Plaintiff is merely seeking information as to what packages these men ultimately received. Given that the terms being discussed for these men were considerably more generous than those offered Plaintiff, coupled with the fact that these employees were not separated from the County until *after* Plaintiff's termination, it is beyond mere conjecture that these four men received better severance agreements. Discovery is therefore needed to run this issue to ground.

Furthermore, many of the discovery requests are tailored towards exploring the basis for the County's proffered justifications for its actions toward Plaintiff. The County contends that it was faced with economic hardship. There are a number of problems with this excuse. First, Plaintiff's position was fully funded through June 30, 2010. Pltf. Aff. at ¶ 33. Second, Stegmaier did not have the authority to eliminate the position of Director of Human Resources Management; only the Board of Supervisors did. Id. at ¶ 34. Third, the Efficiency Team had

15

already identified almost one million dollars in annual savings from the elimination of other positions. Id. at ¶ 35. Fourth, upon information and belief, the employee medical center has generated close to one million dollars in additional gainsharing revenue. Id. at ¶ 36. Fifth, these four men were not separated from the County until after Plaintiff's termination; consequently, their deals were forged in the very same economic climate as Plaintiff's non-deal. Id. at ¶ 37. Finally, to the extent the County may try to argue that Gerner's performance was subpar compared to the men, Plaintiff has sought information concerning sexual harassment charges against Stith. Discovery should be allowed to explore the viability of Defendant's asserted justifications for its action.

The County, however, frustrated by the fact that it has lost two motions to dismiss this matter (one on appeal), has developed a new strategy to try and secure judgment as a matter of law now -- without allowing Plaintiff discovery: Stonewall the Plaintiff.[4] The County will not relent in its view that Plaintiff does not have a cause of action and is accordingly refusing to disclose any information concerning Plaintiff's alleged male comparators. One can easily surmise that the County would not be reluctant to share this information unless there might be information beneficial to Plaintiff's cause of action; after all, Plaintiff has identified four male comparators upon whom her case may rise or fall.

The Court should not allow the County to use discovery as just another venue within which to argue its views on Twiqbal and the viability of Plaintiff's cause of action. Otherwise, when could a lay Title VII plaintiff ever obtain discovery? It is only because Plaintiff was so highly placed within the County's human resources apparatus that she was able to identify four

---

[4] This is further evidenced by the County's objections to depositions. See Letter of July 6, 2012 from County Attorney to Mark D. Dix, Esquire (attached as Ex. E).

male comparators as well as sources of discoverable information.  If a human resources director

cannot obtain discovery and identify sources of information, who can?  No lay County employee

will ever be able to proceed with a Title VII case before this Court if the County's behavior is

rewarded.

Furthermore, rather than exercising its unilateral judgment that discovery on these

matters should not be allowed, the County was required under Fed. R. Civ. P. 26(c) to obtain a

Protective Order from this Court.  Rule 26(c) provides, in relevant part:

> (c) Protective Orders.
>   (1) In General. *A party or any person from whom discovery is sought may move for a protective order* in the court where the action is pending--or as an alternative on matters relating to a deposition, in the court for the district where the deposition will be taken. The motion must include a certification that the movant has in good faith conferred or attempted to confer with other affected parties in an effort to resolve the dispute without court action. The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>     (A*) forbidding the disclosure or discovery*;
>      . . .
>     (D) *forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters*;
>
>   (2) Ordering Discovery. If a motion for a protective order is wholly or partly denied, the court may, on just terms, order that any party or person provide or permit discovery.
>   (3) Awarding Expenses. Rule 37(a)(5) applies to the award of expenses.

Fed. R. Civ. P. 26(c) (emphasis added).  Rather than making such application to this Court, the

County has granted itself a *de facto* Protective Order.

Accordingly, for the foregoing reasons, the County should be compelled to respond in

full to Plaintiff's interrogatories and requests for production.

Furthermore, with respect to interrogatories 9 and 10 and all of the requests for production, because the County acted unilaterally and without authority in denying Plaintiff discovery, Plaintiff respectfully requests an award of attorneys' fees and costs associated with having to bring this motion, pursuant to Fed. R. Civ. P. 37(a)(5).

C)      *Plaintiff's Interrogatories.*

With respect to the number of interrogatories propounded, Plaintiff concedes that under a strict interpretation of Fed. R. Civ. P. 33 (an interpretation rarely employed by practitioners in this jurisdiction), she may have propounded more than twenty-five interrogatories if "subparts" is given an expansive definition.  However, Plaintiff notes that most of the information called for by Plaintiff's interrogatories was co-extensive with information that would have been contained in documents requested through Plaintiff's requests for production.  Had Defendant complied with Plaintiff's requests for production, a simple "see attached documents for responsive information" would have sufficed to answer most of the interrogatories.  Consequently, the County is hard-pressed to argue that any additional burden would have been placed upon it because of the number of subparts set forth in the interrogatories.

Nevertheless, Plaintiff respectfully requests leave under Fed. R. Civ. P. 33 to propound only such additional interrogatories as have already propounded upon the County, and requests that the County be compelled to respond such additional interrogatories.  It is worth noting, however, that under its own strict interpretation the County has recently propounded upon Plaintiff more than twenty-five interrogatories.  See Deft. Interr. and Req. for Prod. (attached as Ex. F).

## **CONCLUSION**

This is a Title VII action in which the Defendant believes the Plaintiff should not be allowed any discovery regarding her alleged male comparators.  Defendant refuses to cooperate in discovery because, despite losing two motions to dismiss, it has determined that Plaintiff does not have a cause of action.   Defendant made this decision unilaterally and without authority. Defendant did not seek, let alone secure, a Protective Order prior to making the determination that it would not respond to Plaintiff's discovery.  Plaintiff respectfully requests that Defendant be compelled to respond in full to the aforementioned interrogatories and requests for production, that Defendant be precluded from any further attempts to self-dictate the scope of discovery in this matter, that Plaintiff be awarded her attorney's fees and costs, and that a Magistrate Judge be appointed to handle any future discovery disputes.

WHEREFORE, for the foregoing reasons, Plaintiff respectfully requests that this Honorable Court GRANT the instant motion.

ORAL HEARING RESPECTFULLY REQUESTED.

KARLA GERNER

/ s /

By:_____
            Counsel


Mark D. Dix [VSB #42718]
BUCCI & DIX, LLC
11449 Robious Road
Richmond, Virginia 23235
Tel.: (804) 888-9500
Fax: (804) 888-9507
Email: mdix@buccidix.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of July, 2012, I electronically filed the foregoing Memorandum of Points and Authorities in Support of Plaintiff's Motion to Compel using the CM/ECF system, which will send notice of filing and an electronic copy to the following:

Jeffrey L. Mincks, Esquire
Stylian P. Parthemos, Esquire
Julie A.C. Seyfarth, Esquire
Office of the Chesterfield County Attorney
P.O. Box 40
Chesterfield, Virginia 23832-0040
*Counsel for Defendant*

/ s /

_____
Mark D. Dix [VSB #42718]
BUCCI & DIX, LLC
11449 Robious Road
Richmond, Virginia 23235
Tel.: (804) 888-9500
Fax: (804) 888-9507
Email: mdix@buccidix.com